Robert A. Cohen
Valerie A. Szczepanik
Lucas M. Fitzgerald
Jon A. Daniels
Alison R. Levine
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0069 (Fitzgerald)
Email: fitzgeraldl@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                                 **Plaintiff,**  :          **18 Civ.     (     )**
                                             :
                 **- against -**             :          **COMPLAINT**
                                             :
**SOHRAB ("SAM") SHARMA**                    :
**and ROBERT FARKAS,**                       :          **JURY TRIAL**
                                             :          **DEMANDED**
                                             :
                               **Defendants.** :

-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Sohrab "Sam" Sharma ("Sharma") and Robert Farkas ("Farkas") (together,

the "Defendants"), alleges as follows:

**SUMMARY**

1.      From approximately July 30, 2017 through October 5, 2017, Defendants raised at

least $32 million from thousands of investors through the sale of unregistered securities issued

by Centra Tech., Inc. ("Centra"), an entity controlled primarily by Defendants.  The Centra

securities were issued in a so-called "initial coin offering" ("ICO"), a term that is meant to

describe the offer and sale of digital assets issued and distributed on a blockchain.  Defendants

sold the Centra Token (CTR) ("CTR Token" or "Centra Token"), an ERC20 token issued on the

Ethereum blockchain, in Centra's ICO.  Defendants promoted the Centra ICO by touting

nonexistent relationships between Centra and well-known financial institutions, including Visa,

Mastercard and The Bancorp.

2.     Defendants, individually and through Centra, engaged in an illegal unregistered

securities offering and, in connection with the offering, engaged in fraudulent conduct and made

material misstatements and omissions designed to deceive investors in connection with the offer

and sale of securities in the Centra ICO.  By doing so, Defendants violated and aided and abetted

Centra's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities

Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule

10b-5 thereunder.

3.     The Centra ICO was an illegal offering of securities for which no registration

statement was filed with the Commission or was then in effect, and as to which no exemption

from registration was available.  The Centra ICO was a generalized solicitation made using

statements posted on the internet and distributed throughout the world, including in the United

States, and the securities were offered and sold to the general public, including to United States

investors, in this district and elsewhere.

4.     Centra raised funds from investors — purportedly to create the "Centra Line" of

products — a financial services system that would enable holders of various hard-to-spend

"cryptocurrencies" to convert their assets easily into legal tender, such as U.S. dollars, and spend

"cryptocurrencies" in real time with the "Centra Card."

5.     Specifically, Defendants claimed in promotional materials on Centra's website, in

various social media platforms, and in Centra offering materials, that Centra offered a physical

"crypto debit card" that was connected to a virtual "smart wallet" via an Apple or Android smartphone application.

6.     Defendants also claimed that — through Centra's "partnerships" with Visa, Mastercard, and The Bancorp — the Centra wallet, debit card and application would allow users to exchange, withdraw, or spend "cryptocurrencies" anywhere that accepts Visa and Mastercard.

7.     Defendants created, reviewed, and distributed marketing materials promoting Centra and the ICO, which claimed that the CEO and Co-Founder of Centra was an experienced businessman named "Michael Edwards," and Sharma stated in a public interview that "Edwards" invested "a lot of capital originally" to help establish Centra.

8.     Defendants also claimed directly and through Centra's marketing materials that the "Centra Token Rewards Program" entitled investors to share in Centra's future earnings. Specifically, Defendants claimed that token holders would be paid "rewards" of 0.8% of the total revenue that Centra earned from Centra Card transactions.

9.     Contrary to Defendants' false representations, and as Defendants knew or recklessly disregarded:  (i) Centra did not have any "partnership" or other relationship with Visa, Mastercard, or The Bancorp; (ii) "Michael Edwards" and other Centra executives pictured in its promotional materials were fictional, and the photographs used to identify the fictional "executives" were photos taken from the internet or pictures of Defendants' relatives; and (iii) investors who purchased Centra Tokens would *not* receive future payments or "revenue share" from agreements with Visa or Mastercard.

10.     The foregoing false and misleading statements appeared variously on the Companies' websites, including in a white paper ("White Paper") issued and updated by

Defendants in connection with the offer and sale of its securities during the Centra ICO, as well as in numerous other online fora such as social media, websites, and press releases.

## VIOLATIONS

11.     By engaging in the conduct set forth in this Complaint, Defendants engaged in and are engaged in ongoing securities fraud in violation of Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and, without a registration statement being in effect or filed, Defendants engaged and are engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.     Through this action, Commission seeks a judgment: (a) permanently enjoining Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Defendants, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; and (e) prohibiting Defendants, pursuant to Section 21(d)(5) of

the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in any offering of digital or other securities.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Each of the investments offered in the Centra ICO as described in this Complaint is an investment contract and, therefore, a "security" as that term is defined under Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S.C. § 78c(a)(10)].

16.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Several victims of Defendants' scheme reside in the Southern District, and Defendants utilized a digital asset exchange located in the Southern District to exchange digital assets fraudulently obtained in the Centra ICO for U.S. dollars.

## FACTS

### I.     Defendants

17.     **Sohrab "Sam" Sharma**, age 26, resides in Florida, is a founder of Centra and has held various positions at the company including President, Co-Founder, and Chief Technology Officer.  On October 31, 2017, Centra announced that Sharma was resigning in an official

capacity to "support the continued growth of the Company." At the time of its formation, Sharma had a 100% ownership interest in Centra.

18. **Robert Farkas**, age 31, resides in Palm Beach Gardens, Florida, and is currently Centra's Chief Operating Officer. He was previously listed as Chief Marketing Officer on Centra's website and promotional materials as well as his own LinkedIn profile, where he described his role as being "[r]esponsible for keeping the public informed of each and every move involved with the Centra Card, Centra Wallet, cBay.io and the Currency Conversion Engine (CCE) Module."

## II.    Other Relevant Entities

19. **Centra Tech., Inc.** was incorporated under the laws of Delaware in July 2017, with its stated principal place of business in Miami, Florida. Neither Centra nor its securities are registered with the Commission.

## III.    Background on ICOs

20. An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for consideration (often in the form of other digital assets — most commonly Bitcoin and Ether — or fiat currency).

21. The tokens are issued on a "blockchain" or cryptographically-secured ledger.[1]

---

[1]  A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

22.     Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called exchanges, and are tradable for other digital assets or fiat currencies.  Often, the tokens are immediately tradable.

23.     ICOs are typically announced and promoted through public online channels.  Issuers usually release a "whitepaper" describing the project and the terms of the ICO.  To participate, investors are generally required to transfer funds (often Bitcoin or Ether) to the issuer's digital address, online wallet, or other account.  After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

**IV.     Sharma and Farkas Fraudulently Raise Funds Through the Centra ICO**

**A.     Background**

24.     In July 2017, Sharma caused Centra to be incorporated.  At the time, he was the sole Director of Centra and was also authorized to issue shares of capital stock of Centra in his sole discretion.  Shortly after its incorporation, Sharma launched Centra's website, https://centra.tech.com.

25.     Sharma oversaw and was intimately involved in all aspects of Centra's operations, including its website, marketing, and strategy.  For example, Sharma often directed various design and technology employees of Centra to make changes to the company's website and White Paper.

26.     Sharma frequently communicated with investors in the Centra ICO and served as the primary public face for the company, often giving interviews with prominent cryptoasset bloggers.

27.     Sharma oversaw the payment of Centra's expenses.  Prior to the company establishing its own bank account, Sharma paid certain costs out of an account for a business he had previously created, Sharma Technology.  Sharma also served as the administrator for certain Centra social media accounts, including the company's Facebook page.

28.     Farkas was responsible for marketing the Centra ICO and helped oversee Centra's social media presence as well as the Centra Token's listing on various trading exchanges.  Farkas also assisted Sharma with general management of the company, including the administration of Centra's email address for responding to questions and complaints from Centra Token investors.

29.     As such, Sharma and Farkas were the masterminds behind Centra, including the creation of Centra, the marketing and promoting of the Centra ICO, and supervising virtually all actions taken by the company relating to the Centra Token offering.

**B.     The Fraudulent Centra ICO**

30.     Centra's unregistered securities offering began on approximately July 30, 2017, shortly after the company was incorporated, and continued through approximately October 5, 2017.  The Centra ICO took place after the Commission's DAO Report of Investigation, which warned the industry that digital securities can be, and often are, securities.  Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO, (Exchange Act Rel. No. 81207) (July 25, 2017).

31.     The Centra ICO included a so-called "pre-sale" of tokens in July and August, and an "official" or "public" sale that ran through September and October.

32.     The White Paper described the Centra ICO as a token offering for which 400 Centra Tokens would be sold for 1 Ether.  As a result of the offering, Centra and Defendants raised at least $32 million from thousands of investors, and its unregistered securities were

distributed throughout the world, including to investors located in the United States, in the Southern District of New York, and elsewhere.

33.     The Centra Token began trading on various digital asset exchanges as early as August 2017, well before the ICO was complete.  The Centra Token initially traded on one such exchange at only approximately $0.15 per share, but as the company's promotional campaign drove increasing investor interest to the ICO, it became listed on 8 to 10 different exchanges and the token price peaked at approximately $4 per share in early January 2018.  Since its peak, the price of the Centra Token has traded down, and it is currently listed at approximately $0.30 per share.

34.     To generate investor interest in Centra's line of products and its ICO, almost immediately after Centra was formed and its website created, Defendants began publicly releasing various versions of a so-called White Paper (the "Centra White Papers") promoting Centra and the ICO to investors.  The Centra White Papers were made publicly available to investors on the Centra website, and by linking to the White Paper from various social media platforms promoting Centra or ICOs generally.  At various times, both Sharma and Farkas circulated copies of the Centra White Papers to potential business partners and exchanges on which Centra hoped to list the Centra Token.

35.     Sharma controlled the Centra White Papers, and was involved at every level in editing and revising each version, as well as when Centra posted a particular draft of the White Paper or took it down.  He was also involved in even the minute details of editing the White Paper, including selecting graphics, fonts and typefaces and the colors used.

36.     Sharma likewise oversaw the development and revision of Centra's website, including, for example, directing the developers to make revisions, and checking whether links worked.

37.     Farkas was also involved in editing the Centra webpage and in Centra's social media presence, by, among other things, directing the developers to make specific edits to the webpage and improve the appearance of Centra's Twitter posts.

38.     Defendants began promoting the Centra ICO as early as July 2017 through press releases and posts to social media, among other formats.  For example, in a press release posted to Bitcoin.com entitled *PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet*, Defendants claimed that the "Centra Card works anywhere that accepts Visa and Mastercard," and touted the Centra ICO as "truly a ground floor opportunity."

39.     Defendants also aggressively touted the Centra ICO on various social media platforms, including Twitter, Instagram, and Facebook.  For example, in an attempt to generate interest in the upcoming ICO "pre-sale," which reportedly ran from approximately July 30, 2017 through August 5, 2017, Centra posted to Twitter on July 22, 2017 via its handle (@centra_card), "I just published 'How to Participate in the Centra ICO?'" and linked to instructions about how to purchase the Centra Token.  On July 30, 2017, Centra tweeted "The Centra Tech Public Pre-Sale ICO is now open.  Contribute between now and 8/5/2017 to get a 25% Bonus!"

40.     Defendants also paid celebrities to promote Centra's ICO.  On September 18, 2017, one celebrity Centra promotor tweeted:  "Centra's (CTR) ICO starts in a few hours.  Get yours before they sell out, I got mine," which Centra re-tweeted on its official Twitter handle.  On September 29, 2017, Farkas tweeted "another one!!" and linked to a fortune.com magazine

article announcing that another celebrity had become the latest celebrity to endorse an ICO, after the celebrity had posted to his social media account regarding the Centra offering.

41.     According to the White Papers, the purpose of the Centra ICO was to raise capital to enable Centra to complete and operate what it termed the "world's first Multi-Blockchain Debit Card and Smart and Insured Wallet," a financial system that would, purportedly, allow holders of various hard-to-spend "cryptocurrencies" to easily convert their assets into legal tender, and spend these "cryptocurrencies" in "real time" using a Visa or Mastercard backed "Centra Card."

42.     According to the Centra website, White Papers, and other marketing materials, Centra purported to have developed an "integrated Cryptocurrency Marketplace & Commerce Solution," using a "Centra Card," a "CBay Marketplace," a Centra Wallet, and a "Currency Conversion Engine & Exchange Platform."

43.     Centra claimed to offer a financial services system that enables users to safely store most major "cryptocurrencies," convert them into legal tender such as USD, and spend them in "real time."  The services include "a Crypto debit card for Bitcoin, Ethereum & more." The debit card was to be connected to a smart wallet that supports multiple cryptoassets, and users would have the ability to access the wallet and cryptoassets via a smartphone application. All assets stored on the Centra wallet would be "safe, secure" and "fully insured" by the "Protarian Insurance Group."

44.     Through Centra's claimed partnership with Visa, Mastercard, and The Bancorp, the wallet, debit card, and smart phone application allowed users to exchange, withdraw, or spend cryptoassets in the U.S. and all over the world in real time, with zero fees and no exchange rate.  The marketing materials claimed that Centra's future services would include a platform

called CoinBay, which will be "the world's first Amazon style superstore designed to make crypto currency acceptable."

45.     According to its marketing materials, at the time of the ICO Centra was also in the "final stages" of launching its Centra Network Exchange, which would allow users the ability to "buy/sell/trade" all supported cryptoassets, including Centra's own CTR Token.

46.     Once the ICO had launched, prominently displayed near the top of the Centra's website was a button that transferred users to the "Token Sale," where they were urged to "BUY TOKENS NOW INSTANTLY."  Several links throughout the website also transferred users to the Centra White Paper and encouraged them to read the document.

47.     Clicking on the "Token Sale" button led users to a page through which they could transfer funds to Centra using the digital assets Ether, Bitcoin, and Litecoin.

48.     The link to the Centra White Paper led to a PDF document that contained additional statements about the supposed Centra Token.  For example, the White Paper described the purchase of the Centra Token as a chance to "join our success and mission while generating a profit."

49.     The investments offered during the Centra ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

**V.      Defendants' Material Misrepresentations and Omissions Regarding Centra**

50.     In addition to their failure to register the Centra ICO, Defendants made false and misleading statements and omissions in the promotional materials accompanying Centra's ICO. Defendants made these misleading statements and omissions knowingly, recklessly, or negligently.

51.     Specifically, Defendants made numerous of false or misleading representations and omissions regarding:  (1) Centra's partnerships with credit card companies and other financial institutions; (2) certain Centra executives; and (3) potential profits to investors from the Centra Token in the form of a dividend.

A.     **Defendants Fraudulently Claimed Visa, Mastercard, and The Bancorp Were "Partnered" with Centra**

52.     Much of Centra's initial appeal – and a significant source of potential value to prospective investors and investors – was due to the company's claim that the Centra Card would operate on the Visa and Mastercard networks and allow users to make "real time" transactions with their "cryptocurrency" holdings.  As a result, these digital assets could then be utilized around the world by almost anyone with a "Centra Card."

53.     To emphasize this connection, Defendants displayed images of the Centra Card emblazoned with the Visa logo throughout its website, White Papers, social media accounts, and other forums.

54.     For example, a 31-page White Paper publicly available on the Centra website in July 2017 (the "July White Paper") prominently touted Defendants' claimed "partnership" with Visa and Mastercard.  The July White Paper contained:

    a.  a statement that:  "For our United States clients, the Centra Card will be a Visa card, while for international users the Centra card issued will be a Mastercard," and that, "[w]ith a market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

      b.   a "Centra Tech Road Map" detailing Centra's "milestones" and

accomplishments to date.  Among other milestones, the roadmap stated that in

January 2017 Centra "signed [a] licensing agreement with Visa USA" and

formed a "major banking partnership."

      c.   images of a Centra Card with the Visa and Mastercard logos boldly displayed

next to Centra's own logo—a gold coin with a "C" in the middle.  It also

devoted a full half-page to a large graphic displaying the Visa, Mastercard and

The Bancorp logos under the heading, "Centra Tech Partners."

      d.   Statements that the Centra Black Card "founders edition" – Centra's exclusive

card purportedly reserved for the first 500 ICO investors who invested at least

100 Ether (approximately $25,000 as of July 2017) – (i) was "backed by

Visa;" (ii) entitled the card holder to "rental coverage by Visa;" and (iii) had

"protec-tion [sic] 50K by Visa."

     55.     In an interview on the podcast "Neocash Radio" on August 14, 2017, Sharma

touted Centra's relationships with Visa and Mastercard, explaining that: "Internationally we

currently have our license with Mastercard to service international clients, domestically we have

a Visa partnership, so we're able to issue Visa cards domestically, and Mastercards

internationally."  Sharma's personal Twitter account also falsely linked the Centra Card to Visa

by displaying a picture of a black Centra Card with a Visa logo.

     56.     Farkas similarly touted the connection between the Centra Card and Visa and

Mastercard.  As part of his attempt to purchase several promotional articles from an online

marketer, on or about September 6, 2017, Farkas emailed to an online promoter that Centra's

currency conversion module, "give[s] the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard."

57.     On October 13, 2017, Farkas emailed Sharma his edits to an investor pitch deck dated August 15, 2017, promoting Centra and its ICO.  The pitch deck stated, among other things, that:  (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

58.     Neither Visa nor Mastercard, however, had any relationship or partnership with Centra, and certainly none where Centra was authorized to issue, sell, or otherwise distribute Visa or Mastercard credit or other payment cards.

59.     As a result, on or about October 10, 2017, Visa directed Centra to "**cease-and-desist from using the Visa-Owned Marks and from promoting that it is an authorized distributor of VISA payment cards [and] that any and all uses or references to VISA-Owned Marks or any reference to Visa be immediately taken down from the [Centra website] or from any other online mediums (including social media sites and press releases)."** (Emphasis in original.)

60.     Upon his receipt of the Visa cease-and-desist notice, Sharma immediately responded that, "[t]his matter has been brought to my attention.  I will have this matter rectified in 48 hours."  Forty-eight hours later, on October 14, 2017 – a Saturday – Visa issued a second notice to Sharma, stating that "[d]espite your signed acknowledgment and agreement, we are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized … Without any authorization to use the

VISA brand in connection with the function or promotion of its card products, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand."

61.     Both Sharma and Farkas were aware, were reckless in not knowing, or were negligent in not knowing that Centra had no relationship with Visa or Mastercard at the time of the Centra ICO.

62.     Defendants also falsely stated on Centra's website and in other promotional materials that Centra had a relationship with The Bancorp through which the bank was issuing Visa cards and Mastercard cards with Centra.

63.     Centra claimed in a press release on prdnewswire.com on August 25, 2017 that the "Centra Card Visa® Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa, U.S.A. Inc.  'The Bankcorp' [sic] and 'The Bancorp Bank' are registered trademarks of The Bankcorp [sic] Bank © 2014."

64.     Defendants' claims concerning The Bancorp were also false and misleading because The Bancorp had no agreement of any kind with Centra.

65.     On August 30, 2017, The Bancorp issued a cease and desist notice to Sharma directing Sharma and Centra to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER." (Emphasis in original.)  Sharma immediately forwarded The Bancorp cease and desist notice to Farkas via email.

16

66.    Sharma and Farkas knew, were reckless in not knowing, or were negligent in not knowing that Centra had no relationship with The Bancorp, and that the statements made in Centra's promotional materials regarding such a relationship were materially false and misleading.  Even after receiving the cease and desist notice from The Bancorp, neither Defendant made any attempt to correct the earlier misstatements on Centra's website and in public announcements regarding the company's relationship with The Bancorp.

67.    Centra's alleged relationships with these entities were material to the investment decisions of investors who participated in Centra's ICO.

68.    For example, in approximately October 2017, The Bancorp received numerous phone calls from third parties asking whether the representations on Centra's website were accurate regarding the company's purported relationship with The Bancorp.  Similarly, on October 27, 2017 the *New York Times* printed an article concerning the Centra ICO.  This article suggested, among other things, that although the Centra Card claimed to operate on the Visa and Mastercard networks, neither company had approved a relationship.  Subsequently, Visa also received numerous calls from concerned Centra ICO investors.  In addition, on November 2, 2017, a Centra investor emailed Sharma and demanded a refund of his ICO contributions "based upon your misrepresentation of your association with VISA and Mastercard."

69.    Defendants also made up a fictitious relationship with an insurance company. Centra claimed in its White Paper that, "[a]ll digital currency that Centra Tech holds online is fully insured . . . The policy is provided by a syndicate of insurers through the Protarian Insurance [sic] Group."  In reality, Centra had no insurance policy for its digital currency at the time of the ICO.  Investors and potential investors viewed the fact that Centra had such insurance as material to their investment decision to purchase Centra Tokens.  For example, one

commenter on the Bitcointalk online forum posted on or about August 5, 2017, that the "[White Paper] says it's insured by the Protarian Insurance Group.  Then they must trust Centra will be very secure and/or very profitable."

70.     Centra claimed in its White Papers and other public statements that "Centra Tech holds individual licenses in 38 states" and then proceeded to list the specific locations. According to the White Paper, "[t]hese licenses are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."  In his interview with Neocash Radio on August 14, 2017, Sharma confirmed that the company had licenses in 38 states.  In fact, at the time of the ICO, Centra held no individual licenses and still does not have the claimed licenses in all 38 states.

71.     Centra also claimed that the Centra Token would be listed on various prominent digital asset exchanges.  In emails to investors in mid-August 2017, for example, Sharma stated that the Centra Tokens will "get listed in our sponsoring exchange Kraken with Poloniex and Bitrex to follow after . . ." and also that "[w]e are going to be listed in Kraken, we have the same mutual VC company and will be listed on Kraken . . ."  In fact, Centra has never had any relationship with Kraken and, as of November 2017, had apparently given up trying to be listed on that exchange.  This statement was material to investors, one of whom complained to Sharma that he had been duped into understanding that Centra had an agreement with the Kraken exchange to list the CTR Token at $2, and now that he had discovered this was a false statement, he did not wish to participate in the ICO and requested a refund.

**B.**     **Defendants Used Fictional Executive Biographies to Promote Centra**

72.     In order to make the Centra ICO more attractive to prospective investors,

Defendants listed in Centra's White Papers and on its website several key executives with

impressive work histories and advanced degrees from well-known schools.

73.     "Michael Edwards" was listed as the Chief Executive Officer and Co-Founder of

Centra.  Edwards's LinkedIn profile stated that he had an M.B.A. from Harvard University and

an extensive career in banking, first as a Financial Analyst at Bank of America, then as a VP of

Business Banking at Chase Bank, and most recently as a Senior VP at Wells Fargo.

74.     "Jessica Robinson" was listed as the Chief Financial Officer, who had purportedly

most recently served as the CFO at Johnson Communications for nearly five years.

75.     Neither Edwards nor Robinson is a real person.  A photo of Edwards used in

earlier iterations on Centra's website and in a published White Paper was that of a Canadian

professor with no relationship to the company.  Later versions of the marketing materials

included instead a picture of one of Defendant's relatives purporting to be of "Edwards."  Centra

also created fake LinkedIn profiles for Edwards and Robinson, both of which were deleted after

an online blogger raised questions regarding the two executives.

76.     Defendants knew, were reckless in not knowing, or were negligent in not knowing

that neither Edwards nor Robinson was a real person and that neither worked for Centra.

Defendants did not, however, remove references to either Edwards or Robinson in the Centra

White Papers or promotional materials, which they had access to and control over.

77.     To the contrary, Sharma stated in an interview on or about August 14, 2017, that

"Edwards" had invested "a lot of capital originally" to help establish Centra, and also referred to

Edwards as a "silent partner" at the company in an email sent in advance of an interview with the

19

*New York Times.*  Farkas was connected to the LinkedIn profile for "Edwards" prior its deletion.

Farkas also edited a version of the Centra investor pitch deck on or about August 15, 2017, that

listed "Edwards" as the "VP/Co-Founder" and Robinson as the CFO, and both Sharma and

Farkas were responsible for several versions of the White Paper published on the Centra website

that listed "Edwards" and "Robinson" as members of the Centra team.

### C.   Defendants Falsely Claimed that Investors Would be Paid a Dividend

78.     In the Centra White Papers and in other marketing materials, Sharma and Farkas

both touted Centra's spectacular growth potential.  For example, one such White Paper stated

that "the market capitalization of cryptocurrencies reached a new high of $102 Billion as of 15

June, 2017, an increase of 1363% since Feb. 19, 2016" and that "[o]ne of the major customer

groups of Centra Tech are cryptocurrency holders [who] face difficulty shopping and executing

transactions only using cryptocurrencies.  They are frequently international shoppers [who would

be] taking the most advantage of Centra's CCE (Currency Clearance Engine) and its ability to

offer them the best exchange rate instantly."  Thus, according to the White Paper, "the time is

ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit

Card anywhere in the world that accepts Visa."  The October 2017 pitch deck edited by Farkas

also highlighted Centra's strong growth potential and suggested that company revenues would

grow to nearly $12 million by 2021.

79.     In connection with touting Centra's growth potential and the benefits of investing

in Centra's ICO, the White Papers promised that Centra investors "will receive a 0.8% Eth[2]

reward for every transaction in the network."  When Sharma was asked what this meant in a

publicly available interview posted to YouTube in August 2017, he responded that, of the money

---

[2]  "Eth" is a reference to the digital asset Ether.

Centra earned from its "revenue share" agreement with Visa and Mastercard, Centra would pay 0.8% back to token holders.  As such, similar to a dividend, Centra investors were promised a percent of Centra's future revenue stream from its purported partnership with Visa and Mastercard.

80.     Defendants knew that the White Papers' claims that Centra intended to pay a dividend like "reward" to investors were false.  For example, in early September 2017, Sharma explicitly acknowledged to a large CTR Token investor that Centra would not pay token holders a 0.8% "dividend reward."  In a series of messages between Sharma and the large investor dated September 6, 2017, the investor complained that he intended to sell all of his Centra Tokens as a result of Sharma and Centra's decision to withhold the 0.8% reward.  The investor stated explicitly that he relied on this promised 0.8% reward when purchasing Centra Tokens, and that Sharma's explanation to him that Sharma and Centra may "not even have the ability to grant these [0.8% dividends] across all network rewards" caused him to lose trust in the company.

81.     In the exchange, Sharma did not dispute that Centra would not pay the 0.8% dividend, and instead offered to pay the dividend, but only to the investor.  Sharma stated: "i [sic] will extend my offer:  My deal to you, and only you since you have been here since the beginning was to extend the whole network reward program to you … this will guarantee you 0.8% for the whole network as individual program specifically designed for you in confidence and NDA … you would get he [sic] 0.8% as if it was a dividend reward."  The investor refused the reward, and instead sold his Centra Tokens on an exchange.

82.     Sharma later forwarded his entire exchange with the investor to Farkas.  Thus, as of September 6, 2017, both Sharma and Farkas knew that:  (i) the claim in the White Paper that

Centra would pay a 0.8% dividend to investors was false; and (ii) when this particular investor learned the truth, he decided to sell all of his Centra Tokens.

## VI.  Actions upon Learning of Commission Investigation

83.     On or about February 9, 2018, Sharma received a subpoena from the Commission requesting certain documents relating to Centra, including the Centra ICO.  On or about February 13, 2018, Farkas received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO.  As a result, by mid-February 2018, both Defendants knew that the Commission was investigating their activities in connection with the Centra ICO and promotion of Centra products.

84.     As of March 30, 2018, Centra's bank accounts were depleted and most of its employees had been terminated.  Upon information and belief, a digital address holding digital assets raised in the ICO had not been depleted.

85.     Farkas made flight reservations to leave the United States on or about April 1, 2018.  Before Farkas was able to board his flight, he was arrested by United States criminal authorities.

86.     Sharma was also arrested on April 1, 2017.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a)-(c)**

87.     The Commission realleges and incorporates by reference paragraphs 1 through 86 of its Complaint.

88.     By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices

to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

89.     By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

### SECOND CLAIM FOR RELIEF
**Violations of Section 17(a)(1)-(3) of the Securities Act**

90.     The Commission realleges and incorporates by reference paragraphs 1 through 86 of its Complaint.

91.     By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

92.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1)-(3) [15 U.S.C. § 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

93.     The Commission realleges and incorporates by reference paragraphs 1 through 86 of its Complaint.

94.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

95.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

### FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Centra's Violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

96.     The Commission realleges and incorporates by reference paragraphs 1 through 86 of its Complaint.

97.     By virtue of the foregoing, Defendants provided knowing or reckless substantial assistance to Centra, which, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to make untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and without a registration statement in effect as to

that security, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus.

98.     By virtue of the foregoing, Defendants aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

Directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

**III.**

Directing each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently barring each of the Defendants from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**V.**

Permanently prohibiting each of the Defendants from participating in any offering of digital or other securities; and

## VI.

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
      April 2, 2018

SECURITIES AND EXCHANGE COMMISSION


By: **_____s/ Robert A. Cohen_____**
       Robert A. Cohen
       Chief, Cyber Unit
       Division of Enforcement

       Valerie A. Szczepanik
       Lucas M. Fitzgerald
       Jon A. Daniels
       Alison R. Levine
       Attorneys for the Plaintiff
       SECURITIES AND EXCHANGE
       COMMISSION
       New York Regional Office
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-0069 (Fitzgerald)
       Email: fitzgeraldl@sec.gov