Robert A. Cohen
Valerie A. Szczepanik
Lucas M. Fitzgerald
Jon A. Daniels
Alison R. Levine
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0069 (Fitzgerald)
Email: fitzgeraldl@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,** :

  :

                         **Plaintiff,** :     **18 Civ. 02909 (DLC)**

  :

         - against -            :     **AMENDED**

  :     **COMPLAINT**

  :

**SOHRAB ("SAM") SHARMA, ROBERT FARKAS,** :     **JURY TRIAL**
**and RAYMOND TRAPANI,** :     **DEMANDED**

  :

  :

                     **Defendants.** :

------------------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Sohrab "Sam" Sharma ("Sharma"), Robert Farkas ("Farkas"), and Raymond

Trapani ("Trapani") (together, the "Defendants"), alleges as follows:

## SUMMARY

      1.     From approximately July 30, 2017 through October 5, 2017, Defendants raised at

least $32 million from thousands of investors through the sale of unregistered securities issued

by Centra Tech, Inc. ("Centra"), an entity controlled primarily by Defendants. The Centra

securities were issued in a so-called "initial coin offering" ("ICO"), a term that is meant to

describe the offer and sale of digital assets issued and distributed on a blockchain.  Defendants sold the Centra token ("Centra Token" or "CTR Token"), an ERC20 token issued on the Ethereum blockchain, in Centra's ICO.  Defendants promoted the Centra ICO by touting nonexistent relationships between Centra and well-known financial institutions, including Visa, Mastercard and The Bancorp.

2.     Defendants, individually and through Centra, engaged in an illegal unregistered securities offering and, in connection with the offering, engaged in fraudulent conduct and made material misstatements and omissions designed to deceive investors in connection with the offer and sale of securities in the Centra ICO.  By doing so, Defendants violated and aided and abetted Centra's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

3.     The Centra ICO was an illegal offering of securities for which no registration statement was filed with the Commission or was then in effect, and as to which no exemption from registration was available.  The Centra ICO was a generalized solicitation made using statements posted on the internet and distributed throughout the world, including in the United States, and the securities were offered and sold to the general public, including to United States investors, in this district and elsewhere.

4.     Centra raised funds from investors to create the "Centra Line" of products, a purported financial services system that would enable holders of various hard-to-spend "cryptocurrencies" to convert their assets easily into legal tender, such as U.S. dollars, and spend "cryptocurrencies" in real time with the Visa- and Mastercard-backed "Centra Card."

5.     Specifically, Defendants claimed in promotional materials on Centra's website, in various social media platforms, and in other Centra offering materials, that Centra offered a physical "crypto debit card" backed by Visa and Mastercard that was connected to a virtual "smart wallet" via an Apple or Android smartphone application.

6.     Defendants also claimed that – through Centra's "partnerships" with Visa, Mastercard, and The Bancorp – the Centra wallet, debit card and application would allow users to exchange, withdraw, or spend "cryptocurrencies" anywhere in the world that accepts Visa and Mastercard.

7.     Defendants created, reviewed, and distributed marketing materials promoting Centra and the ICO, which claimed that the CEO and Co-Founder of Centra was an experienced businessman named "Michael Edwards," and Sharma stated in a public interview that "Edwards" invested "a lot of capital originally" to help establish Centra.

8.     Defendants also claimed directly and through Centra's marketing materials that the "Centra Token Rewards Program" entitled investors to share in Centra's future earnings. Specifically, Defendants claimed that token holders would be paid "rewards" or a "dividend reward" of 0.8% of the total revenue that Centra earned through its "revenue share" agreement with Visa and Mastercard.

9.     Contrary to Defendants' false representations, and as Defendants knew or recklessly disregarded:  (i) Centra did not have any "partnership" or other relationship with Visa, Mastercard, or The Bancorp; (ii) "Michael Edwards" and other Centra executives pictured in its promotional materials were fictional, and the photographs used to identify the fictional executives were photos taken from the internet or pictures of other individuals; and (iii) investors

who purchased Centra Tokens would *not* receive future payments or "revenue share" from agreements with Visa or Mastercard.

10.     The foregoing false and misleading statements, as well as additional false and misleading statements described below, appeared variously on the company's website and in versions of white papers ("White Papers") issued and updated by Defendants in connection with the offer and sale of its securities during the Centra ICO, as well as in numerous other online fora such as social media, websites, and press releases.

## VIOLATIONS

11.     By engaging in the conduct set forth in this Complaint, Defendants engaged in and are engaged in ongoing securities fraud in violation of Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and, without a registration statement being in effect or filed, Defendants engaged and are engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.     Through this action, Commission seeks a judgment: (a) permanently enjoining Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15

U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d)

prohibiting Defendants, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or

director of any public company; and (e) prohibiting Defendants, pursuant to Section 21(d)(5) of

the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in any offering of digital or other

securities.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  Defendants, directly or

indirectly, have made use of the means or instruments of transportation or communication in, and

the means or instrumentalities of, interstate commerce, or of the mails, in connection with the

transactions, acts, practices, and courses of business alleged herein.

15.     Each of the investments offered in the Centra ICO as described in this Complaint

is an investment contract and, therefore, a "security" as that term is defined under Securities Act

Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S.C.

§ 78c(a)(10)].

16.     Venue is proper in the Southern District of New York pursuant to Section 27 of

the Exchange Act [15 U.S.C. § 78aa].  Several victims of Defendants' scheme reside in the

Southern District, and Defendants utilized a digital asset exchange located in the Southern

District to exchange digital assets fraudulently obtained in the Centra ICO for U.S. dollars.

## FACTS

### I.  Defendants

17.  **Sohrab "Sam" Sharma**, age 26, resides in Florida, and is a founder of Centra and held various titles at the company including President and Chief Technology Officer.  On October 31, 2017, Centra announced that Sharma was resigning in an official capacity to "support the continued growth of the Company."  At the time of its formation, Sharma had a 100% ownership interest in Centra.  Sharma was arrested by agents of the Federal Bureau of Investigation ("FBI") on April 1, 2018.

18.  **Robert Farkas**, age 31, resides in Florida, and is a founder of Centra and held various titles at the company including Chief Operating Officer and Chief Marketing Officer.  On Centra's website and other promotional materials as well as his personal LinkedIn profile, Farkas described his role at Centra as being "[r]esponsible for keeping the public informed of each and every move involved with the Centra Card, Centra Wallet, cBay.io and the Currency Conversion Engine (CCE) Module."  Farkas was arrested by agents of the FBI on April 1, 2018.

19.  **Raymond Trapani**, age 26, resides in Florida, and is a founder of Centra and held various titles at the company including Chief Operating Officer and "Strategic Manager."  On October 31, 2017, Centra announced that Trapani was resigning in an official capacity to "support the continued growth of the Company," but Trapani is still listed as an "Adviser" to the company on his LinkedIn profile.  Trapani was arrested by agents of the FBI on April 20, 2018.

### II.  Other Relevant Entities

20.  **Centra Tech, Inc.** was incorporated under the laws of Delaware in July 2017, with its stated principal place of business in Miami, Florida.  Neither Centra nor its securities are registered with the Commission.

### III.    Background on ICOs

21.    An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for consideration (often in the form of other digital assets – most commonly Bitcoin and Ether – or fiat currency). The tokens are issued on a "blockchain" or cryptographically-secured ledger.[1]

22.    Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called exchanges, and are tradable for other digital assets or fiat currencies.  Often, the tokens are immediately tradable.

23.    ICOs are typically announced and promoted through public online channels.  Issuers usually release a "white paper" describing the project and the terms of the ICO.  To participate, investors are generally required to transfer funds (often Bitcoin or Ether) to the issuer's digital address, online wallet, or other account.  After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

---

[1]  A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks.  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain.  The system relies on cryptographic techniques for secure recording of transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

**IV.     Defendants Fraudulently Raise Funds Through the Centra ICO**

**A.     Background**

24.     In July 2017, Sharma caused Centra to be incorporated.  At the time, he was the

sole Director of Centra and was also authorized to issue shares of capital stock of Centra in his

sole discretion.  Shortly after its incorporation, Sharma launched Centra's website,

https://centra.tech/.

25.     Sharma, Farkas, and Trapani, co-founded Centra.

26.     Sharma oversaw and was intimately involved in all aspects of Centra's operations,

including its website, marketing, and strategy.  For example, Sharma often directed various

design and technology employees of Centra to make changes to the company's website and

White Papers.  Sharma frequently communicated with investors and prospective investors in the

Centra ICO and served as the primary public face for the company, often giving interviews with

influential cryptoasset bloggers.

27.     In this capacity, Sharma made misrepresentations to Centra investors and

prospective investors, including by directing investors to the Centra promotional materials which

he knew contained numerous false statements concerning the company and its purported

business.

28.     Sharma also oversaw the payment of Centra's expenses.  Prior to the company

establishing its own bank account, Sharma paid certain costs out of an account for a business he

had previously created, Sharma Technology.  Sharma also served as an administrator for certain

Centra social media accounts, including the company's Facebook page.

29.     Farkas was responsible for marketing the Centra ICO and helped oversee Centra's

social media presence as well as the Centra Token's listing on various digital asset exchanges.

Farkas also assisted Sharma with general management of the company, including the administration of Centra's email address for responding to questions and complaints from Centra Token investors.  Farkas also oversaw specific edits to certain Centra promotional materials.

30.     Trapani was involved in all aspects of Centra, including the promotional campaigns designed to help sell its unregistered securities.  Trapani was responsible for a variety of issues relating to the fraudulent offering, including managing the distribution of Centra Tokens to investors and responding to individual investors' questions and complaints concerning the offering.  In this capacity, Trapani made misrepresentations to prospective and actual investors, and also directed them to the Centra website, which he knew – or was reckless or negligent in not knowing – contained additional false statements.

31.     Trapani also directed specific revisions to Centra's website and other marketing materials, and helped manage day-to-day activities of Centra, including hiring employees; obtaining office space; and handling various other operational tasks.

32.     As such, Sharma, Farkas, and Trapani were the masterminds behind the Centra fraud, including the creation of Centra, the marketing and promoting of the Centra ICO, and supervising virtually all actions taken by the company relating to the Centra Token offering.

**B.     The Fraudulent Centra ICO**

33.     Centra's unregistered securities offering began on approximately July 30, 2017, shortly after the company was incorporated, and continued through approximately October 5, 2017.  The Centra ICO took place after the Commission's DAO Report of Investigation, which warned the industry that digital securities can be, and often are, securities.  Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO, (Exchange Act Rel. No. 81207) (July 25, 2017).

34.     The Centra ICO included a so-called "pre-sale" of tokens in July and August, and an "official" or "public" sale that ran through September and October.

35.     The White Papers described the Centra ICO as a token offering for which 400 Centra Tokens would be sold for 1 Ether.  As a result of the offering, Centra and Defendants raised at least $32 million from thousands of investors, and its unregistered securities were distributed throughout the world, including to investors located in the United States, in the Southern District of New York, and elsewhere.

36.     The Centra Token began trading on various digital asset exchanges as early as August 2017, well before the ICO was complete.  The Centra Token initially traded on one such exchange at only approximately $0.15 per token, but as the company's promotional campaign drove increasing investor interest to the ICO, the Centra Token became listed on 8 to 10 different exchanges and the token price peaked at more than $6 per token in August 2017.  Since its peak, the price of the Centra Token has traded down, and it was listed at approximately $0.30 per token at the time of Sharma's and Farkas' arrests.  It currently lists at approximately $0.017 per token.

37.     According to the White Papers, the purpose of the Centra ICO was to raise capital to enable Centra to complete and operate what it termed the "world's first Multi-Blockchain Debit Card and Smart and Insured Wallet," a financial system that would, purportedly, allow holders of various hard-to-spend "cryptocurrencies" to easily convert their assets into legal tender, and spend these "cryptocurrencies" in "real time" using a Visa or Mastercard backed "Centra Card."

38.     According to the Centra website, White Papers, and other marketing materials, Centra purported to have developed an "integrated Cryptocurrency Marketplace & Commerce

Solution," using a "Centra Card," a "cBay Marketplace," a Centra Wallet, and a "Currency Conversion Engine & Exchange Platform."

39.    Centra claimed to offer a financial services system that enables users to safely store most major "cryptocurrencies," convert them into legal tender such as U.S. dollars, and spend them in "real time."  The services included "a Crypto debit card for Bitcoin, Ethereum & more."  The debit card was to be connected to a smart wallet that supports multiple digital assets, and users would have the ability to access the wallet and digital assets via a smartphone application.  All assets stored on the Centra wallet would be "safe, secure" and "fully insured."

40.    Through Centra's claimed partnerships with Visa, Mastercard, and The Bancorp, the wallet, debit card, and smart phone applications allowed users to exchange, withdraw, or spend digital assets in the U.S. and all over the world in real time, with zero fees and no exchange rate.  The marketing materials also claimed that Centra's future services would include a platform called Coin Bay, which will be "the world's first Amazon style superstore designed to make crypto currency acceptable."

41.    According to its marketing materials, at the time of the ICO Centra was also in the "final stages" of launching its Centra Network Exchange, which would allow users the ability to "buy/sell/trade" all supported digital assets, including Centra's own CTR Token.

42.    Once the ICO had launched, prominently displayed near the top of the Centra's website was a button that transferred users to the "Token Sale," where they were urged to "BUY TOKENS NOW INSTANTLY."  Several links throughout the website also transferred users to the White Papers and encouraged them to read the document.

43.    Clicking on the "Token Sale" button led users to a page through which they could transfer funds to Centra using the digital assets Ether, Bitcoin, and Litecoin.

44.     The link to the White Papers led to a PDF document that contained additional statements about the supposed Centra Token.  For example, the White Papers described the purchase of the Centra Token as a chance to "join our success and mission while generating a profit."

45.     The investments offered during the Centra ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

*Centra White Papers and Social Media Posts*

46.     To generate investor interest in Centra's line of products and its ICO, almost immediately after Centra was formed and its website created, Defendants began publicly releasing various versions of so-called White Papers promoting Centra and the ICO to investors. The White Papers were made publicly available to investors on the Centra website, and by linking to the White Paper from various social media platforms promoting Centra or ICOs generally.

47.     At various times, each Defendant directed investors, potential investors, and potential business partners to the White Papers, or to Centra's website, which prominently featured the White Papers and promoted the ICO.  Sharma and Farkas also circulated copies of the White Papers to exchanges on which Centra hoped to list the Centra Token.

48.     Sharma controlled the White Papers, and was involved at every level in editing and revising each version, as well as when Centra posted a particular draft of the White Papers or took them down.  He was also involved in even the minute details of editing the White Papers, including selecting graphics, fonts and typefaces and the colors used.

49.     Sharma likewise oversaw the development and revision of Centra's website, including, for example, directing the developers to make edits, and checking whether links worked.

50.     Farkas was also involved in reviewing and editing the Centra website as well as in Centra's social media presence, by, among other things, directing the developers to make specific revisions to the website and improve the appearance of Centra's Twitter posts.

51.     Trapani was also involved in reviewing and editing the White Papers, the Centra website, and the various social media platforms Defendants used to promote Centra.  For example, Trapani directed Centra's developers to create and revise the website and White Papers and to make specific changes to how the information was presented.

52.     Defendants began promoting the Centra ICO as early as July 2017 through press releases and posts to social media, among other formats.  For example, in a press release posted to Bitcoin.com entitled *PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet*, Defendants claimed that the "Centra Card works anywhere that accepts Visa and Mastercard," and touted the Centra ICO as "truly a ground floor opportunity."

53.     Defendants also aggressively touted the Centra ICO on various social media platforms, including Twitter, Instagram, and Facebook.  For example, in an attempt to generate interest in the upcoming ICO "pre-sale," which reportedly ran from approximately July 30, 2017 through August 5, 2017, Centra posted to Twitter on July 22, 2017 via its handle (@centra_card), "I just published 'How to Participate in the Centra ICO?'" and linked to instructions about how to purchase the Centra Token.  On July 30, 2017, Centra tweeted "The Centra Tech Public Pre-Sale ICO is now open.  Contribute between now and 8/5/2017 to get a 25% Bonus!"

54.    As part of these promotions, Defendants created pseudonymous online identities and used them in online chat rooms or bulletin-board forums such as Reddit to promote the Centra ICO or to harass or bully posters critical of Centra.  For example, in a text message conversation with Sharma on or about August 13, 2017, Trapani discussed his response to critical online commenters and explained that he was using a pseudonym for his posts:  "I'm kingbit26 they don't know who that is."  When users started posting additional comments critical of Centra on August 26, Sharma texted Trapani to "[h]op in the ethe[r] delta chat and shut people up," to which Trapani responded "Ok."  Sharma later directed Trapani to use the "mike" pseudonym with another critic of Centra, which Trapani did.

55.    Defendants also paid for positive commentary on their marketing materials to generate additional hype for the offering.  In September 2017, for example, Sharma texted Trapani and Farkas: "When one of you guys wake up plz boost our video.  Buy likes comments.  The most we can Let's get it pumping."  Farkas responded that he was "[o]n it," and later boasted that his efforts had "[b]oosted the f[***] out of it."

56.    Defendants also tried to intimidate online critics with threats – or instead bribe them with Centra Tokens – to remove unfavorable posts or videos.  In August 2017, for example, Defendants discussed by text message a critical video that had been posted about Centra.  Farkas asked whether Sharma had successfully bribed the poster to remove the post, and Sharma responded "Yea 2k CTR [Tokens]."  Sharma explained the nature of this bribe: "To him it's 2 racks.  To us its air Lol."

57.    At this time Centra Tokens traded on various exchanges at approximately $1 per token, meaning Sharma paid the poster roughly $2,000 to remove the critical post.  And, as part

of the ICO, Centra issued 100 million tokens, meaning Defendants had an abundant supply of Centra Tokens with which they could bribe critics of the company.

58.     Similarly, on September 3, 2017, Trapani threatened to sue an individual for trademark infringement if he did not take down a YouTube video critical of the company.  When his threats were unsuccessful, Trapani instead complained to the poster that the YouTube videos were "detrimental to new contributors as your video comes up right after ours" on YouTube, and offered to pay the poster to remove the video.  The poster agreed to the payment, and removed the video critical of Centra.

*Centra's "Bounty Program"*

59.     To generate additional interest in the ICO, Defendants also created a so-called "Bounty Program" to entice third-party promoters to tout the Centra ICO in social media, including on Reddit and similar bulletin board channels dedicated to digital assets, ICOs and blockchain.

60.     Centra promised to compensate bounty participants in Centra Tokens for successful articles, "quality reviews," posts, "likes," and similar activity touting Centra and its ICO, and reserved a "Bounty Pool" which reportedly represented 2% of the total Centra Tokens issued by Centra, or 2 million tokens, for this purpose.

61.     Trapani was primarily responsible for overseeing important aspects of the Bounty Program, including verifying that bounty participants actually touted the ICO, and delivering the Centra Tokens in payment for the promotions.

*Paid Celebrity Promotions*

62.     Defendants also paid celebrities to promote Centra's ICO on social media, which they did at various times over September and October 2017, just before and contemporaneous

15

with the so-called "public" ICO offering of CTR Tokens.  On September 18, 2017, for example,

one celebrity Centra promotor tweeted:  "Centra's (CTR) ICO starts in a few hours.  Get yours

before they sell out, I got mine," which Centra re-tweeted on its official Twitter handle.   These

celebrity posts – which generated significant interest in the ICO – did not disclose that Centra

paid the celebrities significant compensation in exchange for their promotion of the offering.

63.   When he was contacted by a Fortune magazine reporter about the celebrity

promotions of Centra, Trapani claimed that two well-known celebrities had each been hired as a

"managing partner" of Centra.  When the reporter asked whether several posts to social media by

one celebrity were part of a sponsorship or paid advertisement, Trapani responded, falsely: "No

[he] is an official brand ambassador and managing partner of Centra Tech now."  In reliance on

this false claim, on September 28, 2017, Fortune published an article quoting Trapani and

reporting that these well-known celebrities had each been hired by Centra as a "managing

partner."

64.   Shortly thereafter, Farkas tweeted "another one!!" on Centra's official Twitter

feed, and linked to the Fortune article.

*Market Manipulation*

65.   Defendants also manipulated the price of the Centra Token in the weeks leading

up to the ICO.  Defendants' manipulative trading was intended to generate interest in the

company and to ensure that prospective investors were not discouraged by the Centra Token

price – which was then trading on public exchanges between approximately $.15 and $.50 per

token on limited trading volume – or by public comments that were negative of Centra and its

purported products.  As Sharma explained to Trapani in late August 2017, "[c]an't have more

FUD [fear, uncertainty and doubt] . . . There's FUD around[.]  Mainly about price."  Defendants undertook this manipulative trading knowingly, recklessly, or negligently.

66.     As one example of Defendants' manipulations, over August 26 and 27 Sharma and Trapani engaged in a concerted effort to manipulate the CTR Token price higher.  On August 27, 2017, for example, Sharma instructed Trapani to artificially increase the Centra Token price: "Ray keep bumping the price. Do [larger] buys."  Trapani responded "what size," to which Sharma explained "10 ETH plus" and Trapani agreed.  Later that same day, Sharma again instructed Trapani to make additional large purchases, to which Trapani responded "yeah I am doing big buys."  That evening, Sharma noted with approval that "we already pushed the price higher By doing that pump[.]  Naturally We gotta keep doing that[.]  Price is rising."  The next day when Sharma noticed that Trapani was making additional large purchases, he directed Trapani to make the purchases at higher prices: "Gotta do higher than 60," Sharma instructed, and then made clear that he should make the buys at $0.80 per token.  Trapani agreed, after which Sharma responded that they should "[g]et . . . [r]eady for the pump Lol."

67.     When the pump was completed, Sharma messaged Trapani that they had "[b]urned through like 250 ETH" – or approximately $75,000 – and moved "the price higher by 30%."

68.     Based on publicly available market data, Trapani and Sharma's efforts to manipulate the Centra Token price were successful.  During August 26 – 28, 2017, the price of the Centra Token went from approximately $0.50 per token to over $1, and on August 27 the closing price was $6.91 – which represents the highest closing price ever recorded for Centra Tokens.  In addition, while trade volume in early August ranged anywhere from 2,000 to 50,000

transactions per day, on August 26, 2017 the trade volume increased to well over one million tokens traded.

## V.     Defendants' Material Misrepresentations and Omissions Regarding Centra

69.     In addition to their failure to register the Centra ICO with the Commission as a securities offering, Defendants also made false and misleading statements and omissions in the promotional materials accompanying Centra's ICO.  Defendants made these misleading statements and omissions knowingly, recklessly, or negligently.

70.     Specifically, Defendants made numerous false or misleading representations and omissions regarding: (1) Centra's partnerships with credit card companies and relationships with other key financial institutions; (2) Centra's state licenses; (3) certain Centra executives; and (4) a profit-sharing "reward" paid to investors in the form of a dividend.

### A.     Defendants' Fraudulent Claims Regarding Key Financial Institutions

*False Claimed "Partnership" with Visa and Mastercard*

71.     Much of Centra's initial appeal – and a significant source of potential value to prospective investors and investors – was due to the company's claim that the Centra Card would operate on the Visa and Mastercard networks and allow users to make "real time" transactions with their "cryptocurrency" holdings.  As a result, these digital assets could then be utilized around the world by anyone with a Centra Card.

72.     To emphasize this connection, Defendants displayed images of the Centra Card emblazoned with the Visa logo throughout its website, White Papers, social media accounts, and other fora, and frequently referenced the company's purported relationship with Visa and MasterCard in public statements and marketing materials.

73.     For example, a White Paper publicly available on the Centra website in July 2017

(the "July White Paper") prominently touted Defendants' claimed "partnership" with Visa and

Mastercard.  The July White Paper contained:

    a.  a statement that:  "For our United States clients, the Centra Card will be a

        Visa card, while for international users the Centra card issued will be a

        Mastercard," and that, "[w]ith a market cap of cryptocurrencies exceeding

        $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace

        where customers can use Centra Debit Card anywhere in the world that

        accepts Visa."

    b.  a "Centra Tech Road Map" detailing Centra's "milestones" and

        accomplishments to date.  Among other milestones, the roadmap stated that in

        January 2017 Centra "signed [a] licensing agreement with Visa USA" and

        formed a "major banking partnership."

    c.  images of a Centra Card with the Visa and Mastercard logos boldly displayed

        next to Centra's own logo—a gold coin with a "C" in the middle.  It also

        devoted a full half-page to a large graphic displaying the Visa, Mastercard and

        The Bancorp logos under the heading, "Centra Tech Partners."

    d.  Statements that the Centra Black Card "founders edition" – Centra's exclusive

        card purportedly reserved for the first 500 ICO investors who invested at least

        100 Ether (approximately $25,000 as of July 2017) – (i) was "backed by

        Visa;" (ii) entitled the card holder to "rental coverage by Visa;" and (iii) had

        "protec-tion [sic] 50K by Visa."

74.     In an interview on the podcast "Neocash Radio" on August 14, 2017, Sharma touted Centra's relationships with Visa and Mastercard, explaining that: "Internationally we currently have our license with Mastercard to service international clients, domestically we have a Visa partnership, so we're able to issue Visa cards domestically, and Mastercards internationally."  Sharma's personal Twitter account also falsely linked the Centra Card to Visa by displaying a picture of a black Centra Card with a Visa logo.

75.     Farkas similarly touted the connection between the Centra Card and Visa and Mastercard.  As part of his attempt to purchase several promotional articles from an online marketer, on or about September 6, 2017, Farkas emailed the promoter that Centra's currency conversion module "give[s] the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard."

76.     On October 13, 2017, Farkas emailed Sharma his edits to an investor pitch deck dated August 15, 2017, promoting Centra and its ICO.  The pitch deck stated, among other things, that:  (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

77.     When responding to individual investor questions, Trapani also knowingly misled investors into thinking that the "Centra Card" and other financial services purportedly offered by Centra were real.  He directed investors to visit Centra's website, which claimed prominently that the Centra Cards were issued by Visa and Mastercard.  In addition, in August 2017 an investor emailed Trapani asking whether the Centra Smart Wallet – purportedly an application downloadable from Apple and elsewhere that was linked to the Centra Card and allowed users to

transfer and spend digital assets – had been launched yet.  Despite knowing that no Centra

applications or products existed, Trapani responded, falsely, "it's launched" and "I use my app

and Centra Card for everything I do."

78.     Neither Visa nor Mastercard, however, had any relationship or partnership with

Centra, and certainly none where Centra was authorized to issue, sell, or otherwise distribute

Visa or Mastercard credit or other payment cards.

79.     Defendants were aware, were reckless in not knowing, or were negligent in not

knowing that Centra had no relationship with Visa or Mastercard at the time of the Centra ICO.

Indeed, the Defendants acknowledged amongst themselves the extent of their deception in late

September 2017 after the Commission filed an ICO-related enforcement action charging

violations of the securities offering registration and anti-fraud provisions in *SEC v. REcoin*

*Group Foundation, LLC et al.*, 17-civ-05725 (E.D.N.Y., filed Sep. 29, 2017).  That day, Sharma

sent a series of text messages to Trapani and Farkas making clear that Centra had no agreement

or other relationship with Visa specifically, and directing Trapani and Farkas to clean the

company's promotional materials of various false claims including all references to Visa.

80.     For example, prompted by the announcement of the *REcoin* action, Sharma texted

Trapani and Farkas that the "Sec just shut down REcoin.  Read the article.  We gotta clean up

every single thing that we can't do [a]nd can't offer today … Delete all the cards have shipped

info" – a reference to Defendants' false marketing claims that Centra Cards had already been

shipped to investors – "Everything gotta get cleaned up."  As part of this "cleanup," Sharma later

texted Trapani and Farkas to "remove the card with the visa logo on it" from the Centra website,

and "also remove white paper from website for now . . . I think it's best to take the white paper

offline."  When Trapani suggested that "we should have white paper up but maybe just take it

down and reword it as proper as possible," Sharma responded that "I rather cut any fufu Off right [now] Then worry.[2]  Anything that doesn't exist current[ly] we need to remove […] do it asap."

81.    Nonetheless, as of October the Centra website continued to prominently display the Visa logos and tout Centra's purported relationship with Visa.

82.    Indeed, on October 10, 2017, Visa sent Centra and Sharma a cease-and-desist notice directing Centra to "**cease-and-desist from using the Visa-Owned Marks and from promoting that it is an authorized distributor of VISA payment cards [and] that any and all uses or references to VISA-Owned Marks or any reference to Visa be immediately taken down from the [Centra website] or from any other online mediums (including social media sites and press releases)."** (Emphasis in original.)

83.    Upon his receipt of the Visa cease-and-desist notice, Sharma immediately responded that, "[t]his matter has been brought to my attention.  I will have this matter rectified in 48 hours."  Forty-eight hours later, on October 14, Visa issued a second notice to Sharma, stating that "[d]espite your signed acknowledgment and agreement, we are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized … Without any authorization to use the VISA brand in connection with the function or promotion of its card products, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand."

84.    The October 14, 2017 Visa cease-and-desist demand also included a collection of recent screenshots taken of Centra's website, which continued to prominently display the Visa

---

[2] According to www.urbandictionary.com, "fufu" means "fake, not real, not genuine."

logo and tout Centra's purported relationship with Visa.  For example, the material included an October 10, 2017 screenshot of a Centra webpage proclaiming that the Centra "Currency Conversion Engine Module (CCE Module) allows real time conversation of all supported cryptocurrencies to give the used the ability to spend their assets in real time anywhere in the world that accepts Visa or MasterCard."

*False Claimed Relationship with The Bancorp*

85.     In addition to false statements touting its nonexistent relationships with Visa and Mastercard, Defendants also claimed in Centra marketing material that The Bancorp was issuing the Visa- and Mastercard-backed "Centra Card."

86.     For example, Centra claimed in a press release on prdnewswire.com on August 25, 2017 that the "Centra Card Visa® Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa, U.S.A. Inc.  'The Bankcorp' [sic] and 'The Bancorp Bank' are registered trademarks of The Bankcorp [sic] Bank © 2014."

87.     Defendants' claims concerning The Bancorp were also false and misleading because The Bancorp had no agreement of any kind with Centra.

88.     Indeed, when The Bancorp became aware of Centra's false claims that it would issue the Centra Card, the bank issued a strongly worded cease-and-desist dated August 30, 2017 directing Sharma and Centra to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER." (Emphasis in original.)

89.     Sharma immediately sent The Bancorp cease-and-desist notice to Farkas and Trapani, urgently directing that "[w]e gotta get that s[***] [relating to The Bancorp] removed everywhere and blame freelancers lol."  Shortly thereafter, Sharma sent an email to The Bancorp confirming that he had no relationship with the bank, claiming that it was mistake, and that his "free lancers had dropped the ball on this."

90.     Notwithstanding their explicit knowledge that there was no agreement of any kind for The Bancorp to issue any Visa cards or MasterCard cards in conjunction with Centra, and in fact that Centra had never been a customer or client of the bank, Sharma submitted a forged and fictional Bancorp agreement – complete with a fraudulent signature from a nonexistent Bancorp officer – to a potential large investor in Centra.  Specifically, in the process of negotiating an investment from a third-party investment company, Sharma emailed what purported to be a contract representing Centra's banking relationship and agreement with The Bancorp.  This investment company subsequently became Centra's largest investor, investing approximately 40,000 Ether – approximately $14 million at the time of the investment – in the company.

91.     Further, at the time Sharma was attempting to persuade the investment company to invest in Centra, Sharma explicitly acknowledged in private messages to Farkas and Trapani that The Bancorp agreement was fabricated.  Sharma texted, for example, that he was "worried about getting these guys the fufu [fake] . . . contract [] because [they] can verify it."

92.     Defendants thus knew, were reckless in not knowing, or were negligent in not knowing that Centra had no relationship with The Bancorp, and that the statements made in Centra's promotional materials and in communications with prospective investors regarding such a relationship were materially false and misleading.

24

93.     Centra's alleged relationships with these entities were material to the investment decisions of investors who participated in Centra's ICO.

94.     For example, The Bancorp received numerous phone calls from third parties asking whether the representations on Centra's website were accurate regarding the company's purported relationship with The Bancorp.  Similarly, on October 27, 2017 the *New York Times* printed an article concerning the Centra ICO.  This article suggested, among other things, that although the Centra Card claimed to operate on the Visa and Mastercard networks, neither company had approved a relationship. (https://www.nytimes.com/2017/10/27/technology/how-floyd-mayweather-helped-two-young-guys-from-miami-get-rich.html.)  Subsequently, Visa also received numerous calls from concerned Centra ICO investors.  In addition, on November 2, 2017, a Centra investor emailed Sharma and demanded a refund of his ICO contributions "based upon your misrepresentation of your association with VISA and Mastercard."

*False Claim that Centra would be Listed for Sale on a Digital Asset Exchange*

95.     Centra also claimed in marketing materials and in communications with prospective investors that its token would be listed on a popular digital asset exchange (the "Exchange"), a statement that was material to investors because listing on a well-known, high-volume trading platform would facilitate secondary trading of the Centra Token and improve the likelihood of its value increasing.  For example, on August 25, 2017, in a public chat forum, Sharma told investors "we will be in [the Exchange] […] 21 days post ICO."  Sharma repeated this misrepresentation to multiple other investors throughout the offering.

96.     In fact, Defendants knew that the Exchange had not agreed to list the Centra Tokens, and that it had no plans to list it in the future.  For example, in an internal chat conversation between Sharma and Trapani on August 29, 2017, Sharma confirmed that Centra

was not listed on the Exchange, and that he did not think it would be listed on the Exchange in the future.  Later in September 2017, Trapani again sought to have Centra listed on the Exchange.  Trapani texted Sharma, "I need you to cook me up a bill that says I live at 4611 [referencing a residential address].  For [the Exchange].  Matches my ID."  Sharma responded "Don't text me that s[***] lol.  Delete."  As such, Sharma and Trapani were each aware that Centra had no relationship with the Exchange at the time investors were being told that Centra had an agreement to be listed on the Exchange.

97.     This statement was material to investors, one of whom complained to Sharma that he had been duped into understanding that Centra had an agreement with the Exchange to list the Centra Token at $2, and now that he had discovered this was a false statement, he did not wish to participate in the ICO and requested a refund.

### B.     Fraudulent Claim that Centra Held State Licenses

98.     Centra claimed in its White Papers and other public statements that "Centra Tech holds individual licenses in 38 states" and then proceeded to list the specific locations. According to the White Paper, "[t]hese licenses are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."  In his interview with Neocash Radio on August 14, 2017, Sharma confirmed that the company had licenses in 38 states.  In a public chat forum on August 31, 2017, Sharma stated that "[w]e're licensed in 38 states or 36 I have to double check."  In fact, at the time of the ICO, Centra held none of the claimed licenses in any of the 38 states.

99.     This misrepresentation was material because Defendants claimed that Centra had a suite of financial services, including those that enabled users to exchange various digital assets into U.S. dollars and spend them in "real time" using the Centra Card or Centra Wallet.  By

accepting digital assets and exchanging these assets for dollars or other digital assets, Centra's claimed system would likely be subject to federal and state money transmitter licensing requirements, which are required in nearly every state in which money transmission activity takes place.  Without the licenses, Centra could not operate as promised.

100.     Centra's claim to have obtained money transmitter licenses in 38 states was false and misleading because they did not have licenses in even a single state.  Indeed, Defendants complained to each other that they did not have state licenses – and discussed the difficulty of obtaining such licenses – throughout the ICO.  At the outset of the company's marketing – and just a week before Centra started offering the Centra Tokens to investors – Sharma texted Trapani that the "licenses are hard to get with my name just cause I have a DUI.  Other issue is net worth.  Some states want you to be over 100k…."  And on September 2, 2017 – more than a month after the start of the offering – when the company still had no licenses, Trapani sent a message complaining that "[a]ll it is, is like we gotta get money transmuting [sic] bonds for all countries and all states . . ."

101.     Defendants' deception regarding the state licenses continued even after the offering had ended.  In mid-October, for example, Defendants attempted to persuade a small regional bank to issue pre-paid or debit "Centra Cards."  As part of the due diligence process, Centra provided a series of documents purporting to show that Centra held – or had applied to hold – numerous state-issued money transmitter licenses, when it did not hold licenses from any state.

102.     For example, to make it appear as though Centra held a license from the state of Delaware, Sharma submitted a forged document to the bank – replete with the official state seal

and signature of the State Bank Commissioner – that purported to grant Centra a Delaware money transmitter license.

### C.     Defendants Used Fictional Executive Biographies to Promote Centra

103.     In order to make the Centra ICO more attractive to prospective investors, Defendants listed in Centra's White Papers and on its website several key executives with impressive work histories and advanced degrees from well-known schools.

104.     "Michael Edwards" was listed as the Chief Executive Officer and Co-Founder of Centra.  Edwards's LinkedIn profile stated that he had an M.B.A. from Harvard University and an extensive career in banking, first as a Financial Analyst at Bank of America, then as a VP of Business Banking at Chase Bank, and most recently as a Senior VP at Wells Fargo.

105.     "Jessica Robinson" was listed as the Chief Financial Officer, and she had purportedly served most recently as the CFO at Johnson Communications for nearly five years.

106.     Neither Edwards nor Robinson is a real person.  A photo of Edwards used in earlier iterations on Centra's website and in a published White Paper was that of a Canadian professor with no relationship to the company.  The picture of Robinson in early iterations on the website and in a published White Paper appears to be a stock photograph, *i.e.*, of an actor. Centra also created fake LinkedIn profiles for Edwards and Robinson, both of which were deleted after an online blogger raised questions regarding the two executives and whether they existed.

107.     Defendants knew, were reckless in not knowing, or were negligent in not knowing that neither Edwards nor Robinson was a real person and that neither worked for Centra.

108.     Shortly after Centra was incorporated and started marketing the offering, on July 29, 2017, Sharma sent a text message to Trapani noting that he "need[ed] to put real photos on there [the website].  Of the 'team'."  Sharma explained that the website "had fufu [fake] people

on there" and had "been getting called out" by a "troller" online who had raised concerns that team members on Centra's website were not real.  As a result, Sharma wanted to "[j]ust rather cover all tracks now" and "fix all my flaws."

109.   That same day, Sharma sent Trapani another message that he "had one girl contact me lol [and] said take my picture off your site."  Sharma then sent Trapani the picture of "Edwards" used in the early White Papers and website and asked: "U know anyone [t]hat looks like this guy . . . I need someone who kinda looks like him[.]  I can't just change him now People are gonna be like wtf."  Later that same day, Sharma reiterated to Trapani that he "need[ed] to find someone who looks like Michael" for the "[t]eam photos."  Soon after, he described the team members on the website to Trapani: "Everyone real Except Jessica And Mike."  Several hours later, Sharma asked Trapani: "Who do we know looks like Jessica Robinson"?  Later that evening, Sharma said to Trapani: "Gonna kill both Ceo and her[.]  Gonna say they were married and got into an accident."

110.   Trapani caused the image in the White Paper purporting to depict Centra's fictional CEO "Michael Edwards" to be changed from a photograph of the Canadian professor to a photograph of an unidentified third party.

111.   Despite knowing that neither Edwards nor Robinson was a real person, Defendants continued to reference Edwards or Robinson in the White Papers and promotional materials, which they had access to and control over, through at least mid-September.

112.   For example, Sharma stated in an interview on or about August 14, 2017, that "Edwards" had invested "a lot of capital originally" to help establish Centra, and also referred to Edwards as a "silent partner" at the company in an email sent to a *New York Times* reported.

113.    Farkas was connected to the LinkedIn profile for "Edwards" prior its deletion. Farkas also edited a version of the Centra investor pitch deck on or about August 15, 2017, that listed "Edwards" as the "VP/Co-Founder" and Robinson as the CFO, and the Defendants were all responsible for several versions of the White Paper published on the Centra website that listed "Edwards" and "Robinson" as members of the Centra team.

114.    Even after online commenters raised concerns regarding the legitimacy of "Edwards" and "Robinson," Defendants continued to affirm that these executives were real people.  On August 3, 2017, for example, one Centra critic suggested in a public chat forum that "the pictures on website are not real," to which Sharma responded "[w]e are 100% Real . . .We are real lol we went live on facebook and said hello."  Several days later, one commenter asked Sharma to "please address the issue on michael edwards picture, the photo just changed today . . ."  Sharma blamed the change on a "misclarification from the development team that we were working with" and claimed that "[f]reelancers dropped the ball." Sharma then promised a live video to demonstrate the legitimacy of the executives: "Myself, Ray, Mike, Jessica, and Robert will be together this evening.  I promise you that."

115.    Sharma doubled down on his deception several days later when he claimed that Robinson would answer questions in a live online video: "Our CFO will explain in a long detailed interview . . . See this is why I want our CFO to explain.  She will say it clearer…Let Jessica explain it."   In the same public chat forum, Sharma continued to respond to investors over the following week by claiming that the company's CFO would be able to answer various questions.   On August 17, Sharma noted that "Jessica has updated the website! Over 12.7M Raised!"  After Sharma stated in the public chat forum that Centra would announce a new CEO

in mid-August, one commenter asked "what will mike do?"  Sharma responded that "Mike will be a Co-Founder and VP."

116.    In addition to fake LinkedIn profiles of "Edwards" and "Robinson" that Defendants used to promote Centra, Trapani – with encouragement and direction from Sharma – also fabricated his own online profile at a time when he knew potential investors were reviewing the Centra "team," including Trapani, when deciding whether to invest.

117.    In late July 2017, as the Centra promotional campaign for the ICO began, Trapani, with Sharma's assistance, built a fictional online profile of himself that included fake educational and professional accomplishments.  Sharma texted Trapani to "[g]o make a linked in [profile] And add as many connections as you can[.]  Add yourself to centra tech As COo [sic] And add connections."  Sharma then instructed Trapani to "Google Coo linked in profiles And get all the info," and also to "[p]ut precious [sic] jobs Like banks etc."  After Trapani apparently listed Harvard University under the "Education" section of his profile, Sharma directed him to "[t]ake Harvard out Do [l]ike university of Georgia.  It would [be] too suspect everyone from hRvard [sic]."[3]  Sharma also told Trapani to "[a]dd a construction company prior[.]  I'm putting you as foreman."  In a later series of text messages, Sharma wrote to Trapani that they "[s]hould look into signing up with Harvard Or remove from linked in[.]  Don't want any issues Like centra didn't do due deligence [sic] On own employees[.]  We gotta make sure we cover our asses any way possible."

118.    Trapani's LinkedIn profile from August 2017 reflected that he received a Master's Degree in Operations Management and Supervision from the University of California, Los Angeles ("UCLA") from 2010-2015.  In fact, UCLA has never offered a Master's Degree in

---

[3] As noted above, the fake LinkedIn profile for "Michael Edwards" showed that he had obtained an M.B.A. from Harvard University as well.

this subject.  Moreover, Trapani's profile also reflected that he served as General Foreman of the New York-based construction company Safway Atlantic during roughly the same period (January 2011 – October 2016) as when he was purportedly in Los Angeles.

119.    A later version of Trapani's profile from November had eliminated all references to UCLA, and his work history at Safway Atlantic continued only to October 2014.

120.    In short, at Sharma's direction and with his assistance, Trapani created a fraudulent public profile touting nonexistent accomplishments and degrees at a time when they were aware that prospective investors would be evaluating Trapani and his background when deciding whether to invest in the Centra ICO.

**D.    Defendants Falsely Claimed that Investors Would be Paid a Dividend**

121.    In the White Papers and in other marketing materials, Defendants touted Centra's spectacular growth potential.  For example, one such White Paper stated that "the market capitalization of cryptocurrencies reached a new high of $102 Billion as of 15 June, 2017, an increase of 1363% since Feb. 19, 2016" and that "[o]ne of the major customer groups of Centra Tech are cryptocurrency holders [who] face difficulty shopping and executing transactions only using cryptocurrencies.  They are frequently international shoppers [who would be] taking the most advantage of Centra's CCE (Currency Clearance Engine) and its ability to offer them the best exchange rate instantly."  Thus, according to the White Paper, "the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."  The October 2017 pitch deck edited by Farkas and circulated to Sharma also highlighted Centra's strong growth potential and suggested that company revenues would grow to nearly $12 million by 2021.

122.   In connection with touting Centra's growth potential and the benefits of investing in Centra's ICO, the White Papers promised that Centra investors "will receive a 0.8% Eth" – a reference to the digital currency Ether – "reward for every transaction in the network."  When Sharma was asked what this meant in a publicly available interview posted to YouTube in August 2017, he responded that, of the money Centra earned from its "revenue share" agreement with Visa and Mastercard, Centra would pay 0.8% back to token holders.  In a public chat forum on August 31, 2017, Farkas listed as the first item in "Centra's 5-point Advantage" the fact that "Centra tokens will give .8% returns in Eth quarterly to all CTR [Centra Token] holders based on network usage (not personal purchases)."  As such, similar to a dividend, Centra investors were promised a percent of Centra's future revenue stream from its purported partnership with Visa and Mastercard.

123.   Defendants knew that the White Papers' claims that Centra intended to pay a dividend-like "reward" to investors were false.  For example, in early September 2017, Sharma explicitly acknowledged to a large CTR Token investor that Centra would not pay token holders a 0.8% "dividend reward."  In a series of messages between Sharma and the large investor dated September 6, 2017, the investor complained that he relied on this promised 0.8% reward when purchasing CTR Tokens, and stated that he intended to sell all of his Centra Tokens as a result of Sharma and Centra's decision to withhold the 0.8% dividend-like revenue payout.

124.   In the exchange, Sharma did not dispute that Centra would not pay the 0.8% dividend, and instead offered to pay the dividend, but only to the investor in a confidential side-deal.  Sharma stated, "i will extend my offer:  My deal to you, and only you since you have been here since the beginning was to extend the whole network reward program to you … this will guarantee you 0.8% for the whole network as individual program specifically designed for you in

confidence and NDA … you would get he [sic] 0.8% as if it was a dividend reward."  The investor refused the side-deal and promised payout, and instead sold his Centra Tokens on an exchange.

125.    Sharma later forwarded his entire exchange with the investor to Farkas and Trapani.  Thus, as of September 6, 2017, all Defendants knew that:  (i) the claim in the White Paper that Centra would pay a 0.8% dividend-like reward to investors was false; and (ii) when this particular investor learned the truth, he decided to sell all of his Centra Tokens.

**VI.    Actions upon Learning of Commission Investigation**

126.    On or about February 9, 2018, Sharma received a subpoena from the Commission requesting certain documents relating to Centra, including the Centra ICO.  On or about February 13, 2018, Farkas received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO.  On or about February 14, 2018, Trapani received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO.  As a result, by mid-February 2018, Defendants knew that the Commission was investigating their activities in connection with the Centra ICO and promotion of Centra products.

127.    As of March 30, 2018, Centra's bank accounts were depleted and most of its employees had been terminated.  Upon information and belief, a digital address holding digital assets raised in the ICO had not been depleted.

128.    Farkas made flight reservations to leave the United States on or about April 1, 2018.  Before Farkas was able to board his flight, he was arrested by United States criminal authorities.

129.    Sharma was also arrested on April 1, 2018.

130.    Trapani was arrested on April 20, 2018

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a)-(c)**
**Against all Defendants**

131.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

132.    By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

133.    By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**Against all Defendants**

134.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

135.    By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

136.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1)-(3) [15 U.S.C. § 77q(a)(1)-(3)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**Against all Defendants**

137.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

138.    By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

139.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

## FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Centra's Violations of Sections 5(a), 5(c), and 17(a)
of the Securities Act, and Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder
Against all Defendants**

140.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

141.    By virtue of the foregoing, Defendants provided knowing or reckless substantial assistance to Centra, which, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to make untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and without a registration statement in effect as to that security, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus.

142.    By virtue of the foregoing, Defendants aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

Directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

### III.

Directing each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently barring each of the Defendants from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## V.

Permanently prohibiting each of the Defendants from participating in any offering of

digital or other securities; and

## VI.

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
          April 20, 2018

SECURITIES AND EXCHANGE COMMISSION


By: _____
          Robert A. Cohen
          Chief, Cyber Unit
          Division of Enforcement

          Valerie A. Szczepanik
          Lucas M. Fitzgerald
          Jon A. Daniels
          Alison R. Levine
          Attorneys for the Plaintiff
          SECURITIES AND EXCHANGE
          COMMISSION
          New York Regional Office
          200 Vesey Street, Suite 400
          New York, New York 10281-1022
          (212) 336-0069 (Fitzgerald)
          Email: fitzgeraldl@sec.gov